UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA, :

        Plaintiff :

        Docket # 09 CR 443 (PKC)

        - versus - :

ABDUL BASSIT CHOUDARY, :

        Defendant :

---

**DEFENDANT'S SENTENCING MEMORANDUM AND OBJECTIONS TO THE**

**PRE-SENTENCE REPORT**

Defendant comes before the Court for sentence on October 16, 2009.

## Introduction

Defendant plead guilty to conspiracy to commit immigration fraud and make false statements in violation of 18 USC 1546(a). The Pre-Sentence Report is consistent with the plea agreement between the parties in finding that the applicable Guideline Offense Level is 17 (24-30 months incarceration). Defendant's plea agreement with the Government permits Mr. Choudary to seek a non-Guideline sentence below the Guideline's range. This sentencing memorandum will outline the reasons why defendant Choudary's should receive a non-guidelines sentence well below the guideline range.

## Objections to the Pre-Sentence Report

The objections to the Pre-Sentence Report herein will have no effect on defendant's offense level.

Paragraph 15 of the Pre-Sentence Report is drafted in a way that suggests that defendant worked at the Earl David law firm from January 2001 through February 2006. A closer reading of ¶15 demonstrates that it was a cooperating witness (an unnamed attorney) that was working at the law firm from 2001 through 2006. Mr. Choudary was occasionally present at the law firm, as more fully described below, between 1999 and 2002, but did not commence working in the firm until 2005.

To the extent that ¶16 suggests that Choudary had contact with one of Earl David's clients in 2004 and collected the entire fee it is erroneous. In 2004 Mr. Choudary was not working at the firm. Moreover, although Mr. Chouday did collect portions of legal fees on behalf of the firm, the client referred to in paragraph 16 was already a client before Mr. Choudary started working at the firm in 2005. In any event, all fees were turned over to firm management.

**Summary of Facts**

Abdul Bassit Choudary, a very hardworking immigrant, was slowly seduced into working at the corrupt law offices of attorney Earl David. The firm specialized in immigration law, but evidently had a sub-specialty of obtaining false work documents for submission to the Immigration and Naturalization Service on behalf of the firm's clients.

Defendant was introduced to the firm as a legitimate client in 1998. In 1999 when defendant complained of the slow progress of the firm in obtaining his work permit, Earl David offered defendant a legitimate job as a home attendant for Mr. David's elderly father. From 1999 until 2002, defendant worked with the elderly and infirm senior Mr. David as a home attendant. Upon the senior Mr. David's placement in a nursing home in 2002, defendant was fired and commenced working in the construction industry thru 2005. In 2005, at the request of Attorney Earl David, defendant started working at the law firm as a clerk. Shortly thereafter

2

defendant learned of the scheme to file false work documents that forms the basis of the instant offense. Defendant deeply regrets his participation in the scheme.

Although several other firm employees have been arrested in this matter, the alleged leaders of this scheme have not been apprehended. Aside from Choudary, an attorney, a certified public accountant, one of the firm managers, and a corrupt government contract employee have all been arrested and are being prosecuted. Based upon defendant's truthful and complete debriefings his full participation was learned by the government and is outlined in the PSR. The result is an offense level that exceeds the offense level of, firm managers, the CPA who falsified corporate and individual tax returns out of whole cloth, and a government contract employee who took bribes to falsify computer entries. Despite the fact that defendant was a low level employee with no supervisory role, no special skill, and no position of trust, his guideline offense level is higher than that of his co-defendants.

**Summary of Argument**

It is respectfully submitted that an analysis of the 3553(a) factors as they apply to Mr. Chaudary amply justify a non-Guideline sentence below the calculated sentencing range.

**MEMORANDUM OF LAW**

The Supreme Court held in <u>United States v. Booker</u>, 543 US 220 (2005), that the mandatory nature of the Sendtencing Guidelines violated the Sixth Amendment right to trial by jury. To remedy that constitutional defect, the Court excised §(b)(1) from 18 USC 3553, and by so doing fundamentally altered the role of the Guidelines at sentencing.

As amended by <u>Booker's</u> severance and excision of §(b)(1), 18 U.S.C. §3553 now requires a sentencing court to consider numerous factors, only one of which is the applicable guideline sentencing range. In <u>Gall v. United States</u>, 128 S. Ct. 586 (2007) and <u>Kimbrough v.</u>

*United States*, 128 S. Ct. 558 (2007), it was made clear that the Guideline's range is not entitled to greater weight than other 3553(a) factors.

**3553 Factors**

*The Nature and Circumstances of the Offense and History and Characteristics of the Defendnat (3553(a)(1)*

Shortly after arriving in the United States on a visa in the summer of 1998, Abdul Bassit Choudary became a client of the Earl David law firm. He was seeking legitimate status that would enable him to work in the U.S. Approximately 10 or 11 months after becoming an Earl David Law Firm client defendant visited Mr. David to complain that he had seen no progress with his case. Mr. David turned the complaint session into an employment interview. David was looking for a caretaker for his elderly and infirm father. Mr. David, noting defendant's educational achievements and pleasing personality asked defendant if he would become a home care attendant for Mr. David's father. Defendant Choudary needed the work and agreed to become a home attendant for Earl David's father. The employment lasted from 1999-2002.

During the three years that Mr. Choudary worked with Earl David's father, he bathed him and cared for his personal needs. Defendant took the senior Mr. David to doctor's appointments, and notably, to visits to the Earl David law offices in Manhattan so that the senior Mr. David could merely spend time out of the house and in a different environment.

During the 1999 to 2002 time period, upon visiting the law firm with the senior Mr. David, defendant Choudary would try to make himself useful by filing papers, cleaning, and going out for coffee for the attorneys and office staff. He had no idea whatsoever that any unlawful activity was occurring at the law firm during this period of time.

In 2002 Earl David's father had a stroke. Mr. Choudary found the senior Mr. David unconscious and administered CPR until an ambulance arrived. Immediately after the senior Mr.

4

David's stroke he was hospitalized and then placed in a nursing home. Choudary was fired and thrown out of the house by Earl David's wife (who according to defendant has a long psychiatric history including suicide attempts). Evidently seeing no further need for defendant, Mr. David's wife put all of defendant's belongings in the driveway for defendant to find when he returned to the house.

From 2002 to 2005 the defendant worked in construction as a laborer. During this period of time defendant found the wherewithal to start investing in small multiple family dwellings that were in need of repair. Mr. Choudary would work on the dwellings in his spare time while holding full time employment in the construction industry. He fell out of touch with Earl David.

In 2005 defendant Choudary returned to the Earl David law firm to straighten out his immigration status. He had no idea of any firm corruption at this time. Because of his fluency in several languages and his ability to interpret for some of the firm's clients, Mr. David encouraged defendant to leave the construction industry and work as a paralegal/clerk in the Earl David law firm. Defendant Choudary agreed and started working in 2005.

Not long after beginning work at the firm Choudary became acquainted with the instant scheme, which was already ongoing. He participated. Although he did collect money, the money was not for defendant Choudary. He was paid a salary. All monies collected were turned over to Earl David and/or management at the law firm. Choudary did no organizing, management or supervision of firm employees. He collected documents and put together client files.

Defendant Choudary answered to lawyers and managers at the law firm. He was a low level employee who did not share in profits.

***Defendant's Attempts at Cooperation***

5

Shortly after his arrest, Choudary commenced a concerted effort to cooperate with the government. While co-defendants were released on small personal recognizance bonds, defendant had an immigration hold placed upon him. He never argued for bail.

Defendant's first act of cooperation was to turn over to the government hundreds of boxes of law firm files that had been stored in Mr. Choudary's house. After Mr. David had been suspended from the practice of law, defendant had been given the task of storing all the Earl David law firm files. Immediately following his arrest Choudary informed the Government as to the location of hundreds of boxes of Earl David law firm files. Arrangements were made for the Government to pick up the law firm's files.

Choudary was debriefed on at least eight occasions. Each of the debriefings lasted multiple hours. Based upon the difficulty in gaining authorization to read the law firm files, the government held back on offering a cooperation agreement, but indicated to defendant that such an offer was likely so long as the debriefings continued to be productive.

There came a time during defendant's detention at the *Queens Detention Facility,* while playing dominoes, this non-violent defendant was attacked and beaten senseless by a violent felon. Simply by dint of being beaten up defendant was placed in solitary confinement (the offense was merely being in a fight, despite that defendant's participation was limited to that of being a victim).

After several weeks in solitary confinement with very limited privileges, defendant finally received telephone privileges. When he finally spoke to a personal friend, he was so profoundly disturbed by the conditions of his incarceration that he simply railed against everyone — his family, the prosecutors who were debriefing him endlessly, his attorney, his wife, even his children. The Government listened to this particular recording. Defendant had said some unfortunate things. Based upon the recorded call the government determined that defendant's

6

efficacy as a cooperating witness was compromised. The cooperation agreement that defendant hoped for never came. Nonetheless, it would be impossible to argue that defendant's information was not of material assistance to the Government's investigation. At the very least by using defendant's statements to fact check other informants. Moreover it is reasonable to believe that defendant lead the Government to new areas of inquiry and investigation. Regrettably, defendant's cooperation has lead to an enhanced guideline score due to defendant's admission to the full scope of his involvement.

The government does not contend that defendant Choudary profited at the firm beyond his $1,000/week salary. He handled so many documents because he acted as a paralegal. Defendant disclosed to the government the types of fees collected by the firm. The number of documents and the fees involved have lead to the large forfeiture figure and the enhanced guideline offense level. These figures overstate defendant's relative culpability in the scheme and only exist because of his voluntary debriefings.

***Unwarranted Sentencing Disparities Amongst Defendants in the Instant Case Can be Avoided by a Non-Guideline Sentence for Defendant Choudary (3553(a)(6))***

The Earl David law firm prepared thousands and thousands of documents submitted to United States immigration authorities. Many of the documents were fraudulent. The co-defendants prepared fewer documents according to information disclosed in the pre-sentence report, but they included fraudulent tax returns for both individuals and corporations, false data entry, and the abuse of positions of trust. Firm management stands to receive lesser sentences than defendant Choudary. Despite the fact that the documents prepared by a certified public accountant in the instant matter were complex and instrumental in perpetrating the fraud, the CPA is only responsible for forfeiture of $54,225 and less than 99 documents. The public contract employee, who had 300 telephone conversations with a firm manager, only has a $7,000

forfeiture and is liable for very few documents. While documents handled by defendant Choudary were frequently one-page letters from a fictitious employers, one can imagine that corporate tax returns are a bit more involved. Choudary had no special license or skills, and did not abuse any position of trust.

Earl David has never been arrested despite the fact that the Government concedes that the initial complaints about the law firm commenced in 2003. Another firm lawyer is a cooperator. There are obviously other targets of which the undersigned is unaware. Despite all of the high level employees who made big money and abused professional privileges and positions of trust, defendant Choudary has the highest guideline level. This result is unjust. Mr. Choudary should not become the ultimate *fall guy* for this scheme.

If the defendant receives a Guideline sentence, he will receive a sentence longer than any of the attorneys, accountant, corrupt public contract employees, managers, and the people who obviously made millions of dollars in this scheme. Defendant was paid $1,000 per week.

Disparities between Guideline ranges amongst co-defendants may not serve as a reason for departure. (*see* United States v. Joyner, 924 F. 2d 454, 459-61 (2nd Cir. 1991)). Departure is not sought herein. Indeed departure power is no longer the only basis for sentence outside of defendant's sentence range. After United States v. Booker, 543 U.S. 220 (2005), sentencing courts must consider all of the factors set forth in 18 USC 3553(a), which include, "The need to avoid unwarranted sentencing disparity among defendants with similar records who have been found guilty of similar conduct" (18 USC §3553(a)(6)). While the guidelines that were originally promulgated to avoid sentence disparity on a national basis, 3553 (a)(6) is the vehicle to avoid disparity among co-defendants. *See* United States v. Flores, 447 F.3d 145, 157 (2nd Cir. 2006) and United States v. Wills 476 F.3d 102,110 (2nd Cir. 2007) (Disparities among co-

defendants may properly be considered so long as similarities and differences are both considered).

It is respectfully submitted that if defendant receives a Guideline sentence, he will, in effect, receive the longest sentence and bear the full brunt of the conspiracy based solely upon his truthful debriefings in the course of his attempts to cooperate. More culpable co-defendants and unindicted co-conspirators will receive lesser sentences or no sentence whatsoever.

**Conclusion**

It is respectfully submitted that a non-guidelines sentence for defendant Choudary will prevent a profound injustice. He is a substantially less culpable participant than his co-conspirators who have lesser guidelines offense levels. Law-abiding individuals who attest to his helpful nature and work ethic surround his life. Aside from the instant offense Mr. Choudary's life has been an exemplary blend of education, work and family.

Defendant has submitted numerous character references, as well as letters from his dependant children. He is obviously a hard-working and educated individual who poses no threat to violate the laws of the United States in the future. He came to this country seeking to better his life and earn a living. Despite being clearly overeducated he performed the necessary function of caring for an elderly man.

His seduction into the scheme at the Earl David law firm was slow and deliberate. They capitalized on his ability to interpret for firm clients and this has resulted in defendant's utter ruin. His properties are in foreclosure; his civil forfeiture debt is profound and overwhelming despite the fact that he did not profit. His introduction into the scheme was a sequence of desensitizing maneuvers, all the while suggesting that he was helping people stay in the country so they could earn a living to support their families. He never believed that any firm client was

engaged in any underlying criminal activity and there is no evidence that any firm clients engaged in the criminal underground.

      Mr. Choudary has no prior contacts with the criminal justice system. It is respectfully requested that defendant receive a sentence on one year and one day incarceration along with other conditions that The Court deems just and proper.

                                               Respectfully submitted,

                                               Stuart D. Rubin

Dated: October 7, 2009

      Brooklyn, New York


Cc: AUSA David Lebowitz by ECF and Federal Express